Good morning, Your Honors. May it please the Court, my name is Steve Cerny, and I represent Appellant Tara McNeally. I would like to reserve three minutes of my time for rebuttal. This Court should reverse the District Court's entry of summary judgment in favor of appellees on McNeally's claims. The District Court erred when it disregarded or explained away admissible evidence and viewed the evidence in light most favorable to appellees. There are three points that I would like to address today. First, McNeally's First Amendment retaliation claim and the willful participation element. And there's a couple of points I want to clarify under this. But one item that I would like to start with is just expanding on a case that we cited in our brief, and that's Toronto v. City of Minneapolis. And that case cited, discussed, and quoted this Court's Eighth Circuit decision in White v. McNeally. And now part of the decision that I'd like to expand on is that the Court held that the elements of a conspiracy are rarely established through means other than circumstantial evidence. And summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. Counsel, do you agree there's a meeting of the minds requirement here? Yes, there is, Your Honor. The question is what do the minds have to meet on? Is it, what sort of showing did you have to make? In other words, my question is on motive. In order to get the bank on the hook here, what do you need to show about the bank's motive? Yeah. And I would lead into that with saying that the case I was just discussing talked about the willful participation in the meeting of the minds. And it said the plaintiff need not show each participant knew the exact limits of the illegal plan. Rather, there must be at least, I went on to discuss, that there must be at least some circumstantial evidence showing an agreement to take action. So with respect to action, okay. But is there not an additional requirement? In other words, there's a retaliatory animus aspect to this, right, on a basic claim. Then you're trying to hook in the bank here as a non-government actor and you need a meeting of the minds. My question is, does the bank need to share that retaliatory animus that's guided or that the impetus for is a First Amendment protected speech? Or can the bank have mixed motives or other motives? Yeah. And the answer there, Your Honor, in the analysis is there can be a mixed motive. But ultimately, would that action have been taken but for the retaliatory animus? If the school, for example, hypothetically were to take unconstitutional action that triggered a series of events, and then the bank has a mixed motive for what it does. In other words, it opened an investigation based on what the school district said, but it found other misconduct. At what point does that motive matter for the bank? Yeah. And the issue there, Your Honor, is would the bank have taken that action but for the government actor's involvement? At what point in time? When the bank investigation was complete? Or would they, in other words, the whole thing may have been in this hypothetical generated, but at the end, you've got multiple different pieces of information here that are the basis for termination, arguably. And some of those have nothing to do with constitutionally protected speech. That's where I'm struggling to figure out, in order to hook the bank in, what are you showing here? Yeah. And so when you look at all of these factors and you put them together, and this came out in the Helvey case as well, and they discussed Stallings v. Hospin, where you can take a look at these reasons. You have the retaliatory reasons that are outlined in the 12 points and facts that we list, and then you have the bank coming up and saying, no, these are the real reasons that we terminated the bank. Now, as the court said in Helvey, and as we cite in Stallings v. Hospin, another Eighth Circuit case, you can look at factors to determine if there's enough facts where a reasonable cause. And they list things such as a favorable review shortly before the action was taken, whether similarly situated employees that did not engage in protected activity were treated more leniently, and whether the employer changed its explanation for its action, and whether the employer deviated from its policies. And I believe at least three, if not four, of those factors are present in this case. We have Ms. McNeely receiving a praise and only weeks before, a member of the Senior Management Committee sent an email praising her for the fantastic job that she's doing. We also have no prior warnings in her or any incidents of concern that are included in her personnel record. What if we full banned her for protected speech, and the bank fired her because it just wasn't worth it anymore with a business partner? Yeah, and again, it goes back to the same analysis, Your Honor. Are there facts where a reasonable jury could conclude that they did it because of influence from Redmond, because of his... Is influence from Redmond enough, or does it have to be motivated by a desire to retaliate for the exercise of a constitutional right? It goes hand-in-hand, if you will. The banks certainly has to take action because of the same reasons that the government actor is essentially... Well, reasons or motive? Well, both, Your Honor. Here, it can also be... You can look at this from the standpoint of you have somebody that has, and we argue that there's facts that Redmond has influence and authority. It's why they would listen to him. It's why they would go along with it and why they would agree with him on that. Rather than saying, yes, okay, we're doing this because of the retaliatory reasons, here are these other reasons that we came up with. By the way, some of the people at the bank, if not all of them, engage in some of this activity. Other folks have violated policies that we've treated differently. There's another employee that we can use as a comparator who did not engage in protected activity, who engaged in egregious conduct over three months, violating policies, being disruptive in front of customers, saying inappropriate things to female tellers. I think we outline all of those factors on page 18 of our brief. Rather than immediately terminate that person, who I would say engaged in conduct that is far worse than that of Ms. McNeely, they gave him... Ms. Poffer spoke with him, warned him. There were verbal warnings. There was written discipline. Then there was a probation plan that he was put on. He was given over three months before they finally said, okay, we're going to cut ways with this employee. It's no longer worth it for us to try to continue to work with this employee. That is in vast contrast to how their normal procedures in practice and how they addressed the only other employee that was terminated. That is vastly different than this circumstance. Counsel, what do you consider to be the genuine disputed facts that remain and why it was have some re-judgment here? Explain what difference those make. Yeah. Your Honor, a couple of those points, and I'll try to get through them as quickly as I can. There's quite a few. We outline them in our brief. I think some of the most important ones that would help this court... I'm only interested in the ones that are going to matter. The facts that... Not just any fact dispute, but fact disputes that would resolve this case or are necessary to resolve in order to decide this case. I would say that one of the key issues, if not the main issue, that was seen nowhere in Judge Blackwell's order and nowhere in any of the appellee's brief is the email that Redmond sent to the board when he confirmed that he, quote, and I'm inserting the names of the relevant parties, I've communicated with Puffer in regards to appropriate next steps. I should also add that the first step in this particular situation was an attempt by Puffer and I to allow McNeely to make some form of attempt to right her inappropriate actions. That is a very key piece of evidence that goes to the willful participation as well as the meeting of the minds. They weren't just having an opportunity to communicate. He's admitting to the board, which everybody ignored, including the lower court, that he spoke with Puffer, they discussed next steps, and of course... Are you saying that is undisputed or is disputed? It was ignored. The email speaks for itself. We included it in our addendum because it's, I think, a critical piece of evidence. All of this should be taken in the context of Redmond's threat. I won't get into that. It's in the briefs. The next point to answer your question, Judge Smith, is the timing of the investigation. Now, this was focused on heavily by Judge Blackwell and Redmond. Now, I would like to point out that even the bank defendants disagree with Judge Blackwell and Redmond regarding the timing of the investigation. You'll see this in Judge Blackwell's order. You see it multiple times in Redmond's brief. He claims that he only acted when he met with Puffer the next day, and Puffer allegedly told him that the bank was going to first take action and start an investigation. Now, if you look at the actual testimony of Ms. Puffer, Mr. Southworth, the bank president, and Ms. Prouty, the HR rep, they all testified that the decision to investigate, suspend, and McNeely without pay was made later that day, after they received a letter from Redmond, and they were on a call for about, I think it was 30 minutes to an hour, and then they claimed that then that is when the decision was made to investigate him. And that is critical. Who was on that call? That was Ms. Puffer, the vice president of the bank, Bob Southworth, the president, and Kathy Prouty. And I would like, because I don't think all of the record sites are in the brief, but I would like to point out that that is also consistent. The timing of the investigation is also consistent with Ms. McNeely's testimony, that when Ms. Puffer called her that evening, she said, we received this letter regarding your post and your band. The school is going to investigate you, so we're going to investigate you too, and you're suspended without pay. And I would like to point out the appendix sites, because I think this is important, and I don't think all of them were included in the briefing. But Ms. McNeely's testimony on this point is in our appendix at page 330 to 31. Ms. Puffer's testimony on this is page 270 to 71, and page 276. Bob Southworth's testimony is pages 297 to 293 of the appendix, and Ms. Prouty is 309. And I would encourage the court to look at that testimony, and look at Ms. McNeely's testimony, and compare that to the statements of Judge Blackwell, his factual conclusions, and Redmond's arguments, repeated throughout his brief, that Redmond is essentially absolved, and the school is absolved, because they made these decisions first. That is contradictory. That is a big fact issue, Your Honor, to answer your question. I would say the third biggest issue, that's a fact issue, is qualified immunity based on student safety. Now we discussed this in depth in the brief, but I would like to point out that at no point, or reiterate I should say, that at no point up to McNeely's suspension and termination did anyone mention a concern for student safety. Now they state that as of the lunch, where Puffer was informed by Redmond of the post, that as of the lunch they knew about this, or talked about this September 1st and September 7th interactions. So as of that time, they knew about the issues that they claimed formed a concern for student safety. When was that in relation to the calls that were being made to the bank that overwhelmed their system, such that they shut down their phones? Yeah, so this would have been on September 28th, and this is when Ms. Puffer and Mr. Redmond first discussed McNeely's post. They said they also talked about these two other instances. Just to summarize the facts there, despite apparently these student safety concerns and these incidents as being the main reason, none of that, as we discussed in our brief, was ever discussed with her, only the post. To your question, Your Honor, this is days, if not weeks, before these calls were coming in. I'd like to point out that the Eighth Circuit does have case law where if there's disruption or the public is complaining, because a government actor was essentially outed, they can't use that as a reason to then pass blame on to an individual party. Counsel, I'd like to kind of point, I guess, about the school's interests. Can you shift a little bit to the pickering and whether or not pickering applies to the First Amendment claims? And why does it not here? I mean, it seems to me you've got not an employee, but it's pretty clear that the case law permits the pickering analysis to apply when someone has some connection to the government agency and has some kind of responsibility. And two, you've begun to talk about the nature of the school, safety of the kids. This seems to be something that the government wants to have some control over, the teaching of the kids, even if it is the banking aspect of it. Why doesn't pickering apply here? Yeah, and I think that to succinctly answer your question, is that pickering in general is applied on a limited basis outside of the government employer-employee setting. Yes, it applies and has been extended through CONIC and other cases to apply to certain contractors where it's a similar relationship. The government's paying for a health care provider at a hospital the same way it would an employee. But the key distinction here is, and we point this out in citing the Second Circuit case of Wandering Doggo, that this case is different. The reason that pickering is extended to contractors is because the government is paying money and therefore it has an interest to essentially have a little bit more control over the speech of contractors that are similar to employees. Here, the bank is paying the school to be able to have access to parents, teachers, administrators, school officials in order to market their services. And yet part of that contract was certainly the bank is getting the benefits that you've described, but the school is getting a benefit too. And it seems like it's the benefit of education of the students, whether it's in the class, the classes she's teaching, interacting with the bank, going out for the internships. Yeah, and that's a fantastic point. And this issue, pickering, only came up. Nobody argued pickering. Everybody agreed that the agreement doesn't apply. She's a private citizen, the pickering, after discovery was closed, did this come up. So this is less developed. But they essentially hang their hat on the fact that as part of the naming rights agreement, it says that the hometown bank in general is going to provide financial literacy classes. And they've morphed that into, well, she's essentially a teacher, she's doing all these financial literacy classes. That's not true. In the fall of 2021, not one time was she teaching or speaking as a guest speaker. Can I ask a question then? And maybe it's a fact dispute. But on the one hand, sometimes she's characterized as just six to eight hours at the school, working at the sort of bank, teller for the kids and their parents. Other times she's off in the branches. But then it's also described as, but when she's in the branches, she's actually supervising interns from the school. So it sort of seems like you can characterize that in different ways. But if in fact there are students involved in the vast number of hours of her 40 hour week, wouldn't that lean more toward the school? And maybe it's a factual issue that I'm not quite yet have a handle on. Yeah. So two things. I just want to make sure it's clear. She was not teaching at any point in time in the fall of 2021. She wasn't going into classrooms. In fact, she only spoke four or five times as a guest speaker in the summer. And she estimates those less than two hours total that she's ever done these financial speeches, which the whole point of which is to, hey, sign up, do our Star Savers account, join the bank. And to your question, there are two interns, high school aged interns, juniors I believe, so 16, 17, 18, somewhere in that range, that work a few hours at both branches on behalf of the bank. So it's essentially no different than if these students were interning outside of the school setting at any other company or employee. So I don't think the goal of Pickering under that limited circumstance, when that involvement is a very small level, to then say, hey, we're going to control all of the folks that are a part of this relationship. Especially when the bank is the one that's paying for these services and McNeely's not spending any time in the classrooms in the fall of 2021. She's there for, like you said, Judge Kelly, six to seven hours doing normal banking functions. And yes, working with the interns at that time. Unless there are any other questions, I'll reserve the rest of my time for rebuttal. Thank you, Mr. Stegman. Thank you. Ms. McRae. Thank you, Your Honors. May it please the Court, Counsel, I'm here on behalf of Dr. Michael Redmond. And I want to address a couple of issues that Counsel identified at the end. First, there was a suggestion that the decision on the leave of absence was not made until later in the day. That's contrary to the evidence. In our brief, we cite Dr. Redmond's testimony where he talks about the telephone call where Lindsey Puffer told him that the bank was going to be placing her on a leave of absence and doing an investigation. It's also consistent with his letter. In his letter, he says, effective immediately, until such a time as the investigation of this allegation has been completed. It would make no sense that he'd reference the investigation if he didn't know that it was going to happen. Now, the letter you're referencing, is that what's, I guess, could be called the ban letter? It is, Your Honor, yes. And then at the end of his letter, he goes on to say, until the investigation is concluded. So he clearly knows there's going to be an investigation. The testimony is very clear that that came from Lindsey Puffer. There is no fact dispute on that issue. The other fact dispute that Counsel identified is he suggested that somehow qualified immunity is a fact dispute because there's contrary evidence on student safety. There frankly is no evidence on student safety other than what Dr. Redmond testified to. Dr. Redmond testified in his deposition that he was concerned about the increasing erratic behavior by Ms. McNeely. Now, that was not included in the letter, correct? That was not included in the letter. What was that concern based on? What does the evidence say? Was it based on the interaction with Ms. Peterson and then the principal's reports? Is that essentially the evidence that underlies that? Three things, Your Honor. First, it is that interaction at West Middle School on September 1st. Now, what's reported to Dr. Redmond is by Christy Peterson that some woman yelled at her. So, that's all he knows on September 1st. He doesn't know that that woman who yelled at Ms. Peterson was Tara McNeely. Now, Ms. McNeely says she didn't yell. She said something respectful. But again, what matters is Dr. Redmond's mind. What he heard was from Christy Peterson that she got yelled at by a parent. Then we have... But wouldn't it be an important fact dispute if it's disputed that a yell actually happened? No, it wouldn't because what matters is the person's state of mind who's making the decision. And what Dr. Redmond understood from Christy Peterson is three things. Number one, that Tara McNeely got upset with Christy Peterson on September 1st. Number two, that Tara McNeely got upset at Sweeney Elementary. Now, he heard about that from the principal and the principal reported to him that he almost had to call the police on Ms. McNeely. So, that's the second state of mind that he knows. And the third is that he then gets the report that she's made a false statement to Alpha News to the reporter, Hooten. So, if I understand the false statement, the false statement is Ms. McNeely said it was Ms. Peterson who contacted the bank. When Mr. Redmond knows, he's the one who contacted the bank, right?  So, the falsity is not that someone from the school is talking to the bank. It's she got the wrong person. Yes. And she's... So, I mean, that's false. It's inaccurate. But her concern is legitimate, right? Someone from... I'm not asking you to agree with that, but I mean, someone from the school was contacting her employer. Absolutely, because of the erratic behavior. And at the lunch... Well, but the letter says because of the speech. The letter says, until such time as the investigation of this allegation has been completed. So, it's been reported that somebody has reached out to the media, wrongly accusing Christy Peterson of contacting Hometown Bank. Well, again, my point is I'm the one who did it, right? Mr. Redmond is the one who contacted the bank. So, it just... You know what? My point is, from her perspective, so she got the person at the school wrong. The gist of her complaint to the media was correct. And that is someone from the school district is contacting my employer. And if that had happened in isolation, Your Honor, we wouldn't have an issue. What we have is at the lunch that was pre-scheduled between Dr. Redmond and Ms. Puffer, Dr. Redmond learns for the first time that the woman who he understood yelled at Ms. Peterson was Tara McNeely. So, now he knows that she has yelled at an elementary school. She has yelled at a middle school. She is reporting things that he knows to not be accurate. And she's also said in her Facebook post caustic statements about Ms. Peterson. This isn't just people have a right to wear masks and that it's appropriate. She did those things. Nothing happened. Well, I mean, but it could be constitutionally protected speech if you're accusing a public official of not caring, right? I mean, that, I get your point. I mean, it's beyond a policy concern. But would you, are you arguing that's not protected speech? I am, Your Honor. Caustic speech is not protected speech. When she showed up at the school board meetings with the sign masks equals no levy. You're saying it's not protected speech for someone to say that a public official doesn't care? To say that they have no heart and that they have ill will towards children. And what's the case, the best case that suggests that? I will find it as I look through my notes. But the issue is that the speech that she's making is targeted. It's incorrect and inaccurate. So she's making a false statement of fact saying that Christy Peterson is the person who contacted the employer. So had she gone after Mr. Redman in the media, that's okay? Because that would be accurate? If she had said Mr. Redman contacted my employer, yes, that would be accurate. It would be more accurate. Mr. Redman did not contact her employer. Mr. Redman had a pre-scheduled lunch where he went to lunch with Lindsay Puffer. And during the lunch, they both discovered things that had been occurring with Ms. McNeely. And he got concerned. Because as the superintendent, who actually had a very good relationship with Ms. McNeely, Ms. McNeely testified in her deposition that she had Mr. Redman's phone number and texted him. As the mom of two college students, I can tell you I've never had my superintendent's cell phone number. She had access to him. They got along. They spoke. This is not a situation where there was any ill will. They had a very good relationship until she engaged in what he considered to be erratic behavior. And the issue is his reasonable understanding of her conduct. Is that correct? Yes, Your Honor. We look at what he understood at the time in his state of mind. And what he understood was increasing erratic behavior. And based upon that increasing erratic behavior, as a business partner, he contacted the employer. In the letter, he cites the post first, though. Does he not? He does, Your Honor. And quotes it out and then says, oh, and also there's some other factors. You've sort of in the record, he started with the post. He does all three, Your Honor. He actually copies the post exactly. So we're not even mixing words. He just cuts and pastes the post. So the post is there as it is. And then he also says, it's also been reported that Tara McNeely has reached out to some form of media and wrongly accused Kristi Peterson of contacting Hometown Bank. Effective immediately, until such a time as an investigation of this allegation has been completed. So the saying you can't come on school property is not any school property. It's with regard to the bank partnership until the investigation. Does it say that? Yes, Your Honor, it does. Okay. I can't remember what it says. But I thought it said any school district facility. It says, I'm requesting you direct Tara McNeely to not be present in the school zone or any building in any capacity of the school district and bank partnership. He specifically talks about the partnership. He goes on to say that she's free to attend anything with regard to her children. I'm not sure this is material or not. But was there ever a completed investigation by the school district? The school district did not, Your Honor. Is she still subject to the ban, whatever it means, however you might interpret it? To my knowledge, no, Your Honor. It's never been questioned. The other piece that's significant What do you mean it's never been questioned? I mean, is it still She's come on school property without incident, Your Honor. And that's also a misstatement in the record by Ms. McNeely. She claims that she understood she couldn't go to school board meetings. That's inconsistent with the text that she sent days after getting the ban on October 6th where she acknowledged she could go to school board meetings. It's also inconsistent with the testimony in her deposition where she admitted that Dr. Redman made a public statement making it very clear that she was welcome to attend school board meetings and that the letter had nothing to do with preventing her from going to those meetings. So she knew at the time that she was free to vote and she did vote. And she knew that she was free to attend school board meetings. And again, she did attend those meetings. And I see that I'm getting into my colleague's time, so I'm going to stop unless there are further questions. Yes, I'd like for you to elaborate just a little bit more on the justification for a concern for student safety. What are the facts that support that that's a legitimate concern? The facts that support that, Your Honor, are the aggressive behavior. Derek Bell, the principal of Sweeney Elementary School What was the aggressive behavior? yelling at another parent, getting into a verbal altercation when she was there on the campus. Were there specific threats in this communication you're talking about or was it just raised voice? It just seems so indefinite. It's hard to... yelling what? That's not in the record, Your Honor. Was the other parent subject to any action by the school? I don't know. That's not in the record. What we do know is that Derek Bell... Were there any threats? What we do know is that Derek Bell was concerned about... Well, you can answer that question, yes or no. Were there any threats? I don't know because I don't know the specifics of the communication. What I know is there was name-calling and that type of behavior, but it became so aggressive that Derek Bell, the principal, again with no knowledge... That was between two adults, but what would be the concern for the children from two parents having a disagreement? That the behavior was done in front of children. There were children around. It was in front of her daughter. It was in front of other people, and there's an increasing pattern of aggressive behavior, and that was what was concerning. She was there as a representative of the PTO. She was there as a representative of the bank, and she got into a verbal altercation with another parent, and based upon that, there was a concern with all of the events added together that the behavior was becoming erratic, and someone who was previously very well-trusted and well-liked by the students, there was concern by Superintendent Redman that the behavior needed to be investigated, and to be clear, that's all that he asked. He did not have control to fire her. He did not exert control. He did not have authority to fire her. It is very similar to the Jones v. Minneapolis case. But by prohibiting her from coming onto the school campus in any capacity regarding the agreement, she couldn't do... And again, maybe this goes to the fact dispute I spoke with opposing counsel about, but she couldn't do her job. It was a ban until the investigation was complete, and if the investigation had cleared her, she could come back to work. But she couldn't, but the bulk of her work was the school. The bulk of her work was not the school, Your Honor. She was a full-time employee, and she spent between six and eight hours a week at the bank. But then the bank used the ban in part to terminate her employment, correct? It was one of the listed reasons. The bank considered the ban, but again, I'd ask the bank to talk about that because I was not involved in those decisions. But my understanding is it was 100 percent the bank's decision, and each of the officials from the bank has testified to that. And again, it was the increasing erratic behavior, including the inappropriate contacts. Thank you, Ms. McGray. Thank you. Ms. Lurken. Thank you, Your Honors. I'd like to start off by just identifying some fact questions that were asked or where to cite these facts in the record. The first question to respond to is the dates that the phones were shut down at the bank. And so on October 6th and October 8th, the bank had to shut down the school bank location because of the aggressive phone calls and behavior and concern from, I'll say, the community as a whole, and the world as a whole, and concerns about the safety for the bank employees at the school and the school. So those phone calls were to the bank branch at the school, not at the bank branches in the community. My understanding is all of the bank branches got harassing phone calls. It was both within the school, because only Tara McNeely worked within the school as a bank employee, and also the bank branches. And then on the 9th, October 9th, they actually shut down the phones. And that is my understanding. I recall a Saturday, and Mr. Karski, one of the bank senior management, actually was called in to be at the bank with the staff because they personally did not feel safe within the bank. So October 9th is when it was shut down, the phones were shut down, and the whole bank. The 6th and the 8th were just at the school. Does the record contain evidence of what instigated the calls or some proof of responsibility for the calls? I guess it depends on what you mean by proof of responsibility. They were a result of the media information, the information that Tara McNeely provided to the media, and then the media put out there. And as a result, that's when the phone calls started coming in. As to individual people who made the calls or sent emails, there is some information on that. Correct. So help me explain how these phone calls play into the legal analysis for your client. I mean, does it break the causation chain? Is that the argument? Were these phone calls used as a justification to terminate the plaintiff? Correct, Your Honor. They are, because the staff was concerned for their safety. There is evidence in the record that one staff member's child's photo was put on Facebook with this information. Ms. McNeely didn't do that, right? Correct. She personally, to my knowledge, did not do that. It's not in the record. However, the concern was she instigated all of this when she was... Was there any evidence of that? No. By her going to the media, it's all... Well, in other words, what happened became public, fine. And I remember those days. We all do, right? So I get that, but, you know, was it the basis or one of the bases for her termination? It was. It was part of the fourth basis, and that was the staff didn't feel safe working with her. The staff didn't feel safe having her come back, and the staff asked the investigators, Mr. Prouty, excuse me, Ms. Prouty and Mr. Southworth and Ms. Puffer, please don't have her come back. We don't want her to come back. Her coming back will create unrest in the bank, and that's one of the things they looked at. They also had information about how she treated employees prior to this. For example, saying things like, take that diaper off your face. So it did contribute to the termination because during the investigation, they determined they had a whole bank full of people who didn't want her there. What was the cause of the bank opening and investigation? What does the record show about that? The record showed that actually Ms. Puffer told Ms. McNeely prior to getting the letter and prior to actually the media post, or excuse me, McNeely going to the media after the post, that she was going to have to bring this up to upper management. That it wasn't... And what was the... I mean, that was the conversation with Mr. Redman? No, that was the conversation with Ms. McNeely. No, but in other words, she's saying, I need to take this up with upper management. It was simply that she had seen the post? No, Ms. Puffer had information on the two altercations. From Mr. Redman? No, Mr., or excuse me, Ms. Puffer was actually present on the 7th. When that happened, she also caught the tail end of it, is what the evidence shows. Was that the first or the second altercation? The second altercation. Okay, how about the first? She was not personally present at the first, but Ms. Puffer did know about the first because Ms. McNeely, there is in the record, Ms. McNeely told Ms. Puffer about that. Okay, so there was no communication from Mr. Redman to Ms. Puffer that formed the basis of opening the investigation? I mean, I would say there was communication prior to the investigation being opened. They did have that pre-scheduled lunch prior to, so there was that communication. My understanding is the letter from Mr. Redman came during the communication or during the conference call that Ms. Prouty, Mr. Southworth, and Ms. Puffer were already having. What investigation did the bank do? The bank investigated, looked at time records to see whether she was on the clock, which she was on the clock during the September 7th confirmation. She was wearing a hometown bank shirt. The bank investigation led to that. That was the PTO, joint bank PTO meeting, is that right? Like an open house, correct. So she was on the clock for that. They also investigated her email, investigated her time cards, investigated and spoke with people who, the employees who were working with them and their experience. And on that note, Your Honor, I'm going to leave another couple of minutes for my co-counsel. Good morning, Your Honor. Christian Schaefer here on behalf of the school district and Ms. Peterson. I want to make just one very quick distinction. Your hypotheticals, Your Honor, you said if the school had banned her. I just want to remind the court of the distinction between the school and Dr. Redman and the bank. The school is the board. By statute, the board is the only policymaking authority. The board has not delegated that authority to Dr. Redman by practice or by resolution or anything like that, or to Ms. Peterson as well as the board chair. As a board chair, her role was largely ceremonial. As I understand it, the board took no official action. The board took no official action at all, Your Honor, and the record doesn't even have evidence that a quorum of the board, which would be required for official action, was aware of any of this. Ms. Peterson, what's alleged about her direct actions here? The allegation about her direct action is that she somehow caused Dr. Redman or told Dr. Redman or authorized Dr. Redman to call Ms. Puffer and relay the concern about the post or perhaps get Ms. McNeely fired. That evidence is based on there was a phone call after Ms. Peterson received the inquiry from Alpha News. She followed the district's media procedure, which is if you get a media request, call the superintendent and the communications director for direction on how to respond. She got that request, she called the superintendent and the communications director, she asked how to respond, and then she responded to Alpha News. The record shows that Ms. Peterson did not know who Ms. McNeely was at the altercation or didn't know her at all, quite frankly. There is no evidence that she knew anything about or the board knew anything about what Dr. Redman put in his letter or anything about the situation. That piece of disputed evidence or so-called disputed evidence that Mr. Cerny pointed out earlier in the appendix at 488 has no details, Your Honor, about Ms. McNeely or the bank or anything, just vague. This was a situation that came up with a community partner. Our time is up, Your Honor. Unless you have questions, I'll sit back down. I don't see any. Thank you, Mr. Slater. Thank you. Mr. Cerny, your rebuttal. Thank you. I would invite the court, as perhaps time-consuming as it may be, to cross-reference the statements that the appellees are making with respect to what is actually in the record. Let me ask you. I mean, it seems to me on one level there are factual disputes about the escalating nature of your client's conduct and the, quote-unquote, confrontations. Why are those factual disputes material if Mr. Redman was told that there were confrontations? So I think, and this also follows up on your question, Judge Smith, on what are the key fact issues. In the addendum, we have an email between Ms. McNeely and the principal the day after the PTO event. And in this, when she resigns, and the principal responds saying, I'm so sorry to hear that. You've done a fantastic job. I enjoy working with you. I hope I can continue to work. Did Mr. Redman have that? So the point of this, though, is Ms. McNeely responds to the principal the next day saying, I'm resigning for these reasons. And, by the way, last night a woman came up to me. All that may be true. My point is there may be a factual dispute about what happened, whether or not there were confrontations. But it seems to me Mr. Redman was under the impression that there were confrontations. And he was the decision maker. And what I heard your colleagues arguing or your colleague arguing was that's what matters. Was that a reasonable response based on what he had been told? And why is that wrong? It goes to a credibility issue of what he had been told. He claims that the principal told him he had to go up to McNeely, he had to threaten her to leave, and almost had to call the police. What did the principal say? The principal did not know about it. Ms. McNeely explained the whole incident to him and what happened the next day. So how did the principal confront Ms. McNeely, threaten her to leave without police, when the principal, and she's telling him the next day about the incident where somebody came up to her? It's a credibility issue, your honor. And the issue of it raises a concern for student safety. The principal, who knows her, is saying, you've done a fantastic job. I'm sorry to see you leave. I want to continue working with you in the future with the PTO, with students, or otherwise. So it's a credibility issue. Regarding yelling at Peterson, there's a third party fact witness that testified and filed a declaration, this is also in our addendum, saying that McNeely never raised her voice. So there's issues here as to whether student safety, which is not listed in any of the documents, not to the email to the board, not in Puffer's text after she met with Redmond. Puffer admits that they only talked about the post. After the lunch meeting, when these issues came up, that apparently are the main concern, they only talked about the post. And that is Puffer's testimony. Ms. Lurken stated that these other reasons were one of the four bullet points that were included in the termination letter. They're not included in the termination letter. We would ask the court to look at the termination letter, which, of course, the first thing that's listed is the post and the ban. The other thing, Ms. Lurken said that she, or I might be mixing up counsel, wanted to continue to go to board meetings. Ms. McNeely stopped going to board meetings. She did not go to board meetings. She was afraid of getting arrested and criminally detained. She said that, yes, they said this in the media, but nobody's contacted me. And to clarify, another point that was made, nobody has ever lifted the ban. Nobody has ever contacted her about the ban and lifting it. In Ms. McNeely's testimony, she was afraid of getting arrested and criminally detained. She did vote, but she did so quickly in hope that she couldn't be seen. And there's also testimony regarding her emotional state that resulted from this, including being very distraught and having panic attacks when she was going to the school. So she was trying to avoid things and ultimately had to leave the district. Thank you, Mr. Cerny. So with that, I will close. Thank you. The court wishes to thank all counsel for participation and argument before us this morning. It's been helpful. We'll continue to wrestle with the issues and render decision in due course. Thank you. Counsel may be excused. Madam Clerk, would you call Case Number 2?